IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85635-9-I |
| Respondent, | DIVISION ONE |
| v. | |
| PAUL RAFAEL DERVIN, III, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, J. — Randi Jones and Paul Dervin married in 2016 and separated in 2019.  Jones began a relationship with Mychael Greer, a longtime friend of both Jones and Dervin, in 2018.

In February 2020, a jury convicted Dervin of assault in the second degree and unlawful imprisonment after assaulting and kidnapping Jones.  Jones obtained a protection order following the assault.  That following November, Jones was found dead in her home.  The State charged Dervin with felony murder in the second degree.  Dervin maintained that Greer was the real culprit.

A jury convicted Dervin of assault in the second degree, unlawful imprisonment, murder in the second degree, and a violation of the no-contact order.  Dervin appeals, asserting the court erred in excluding evidence of Greer's past assaults and dishonesty, the court violated Dervin's right to present a defense when it refused to remove redactions from an exhibit, the court again violated Dervin's right to present a defense in failing to address governmental

mismanagement of DNA testing, and the court violated Dervin's right to counsel and due process in restricting his closing arguments. Dervin also asserts that cumulative error requires reversal and that remand is necessary to correct a scrivener's error.

We affirm Dervin's convictions and remand for the trial court to correct the scrivener's error.

## FACTS

### Background

Randi Jones and Paul Dervin married in 2016. Jones had an adult child from a prior relationship, Edward Barquet, and Jones and Dervin share one child, C.D. Jones and Dervin separated in 2019. Leading up to Jones's death, they intended to divorce.

Jones began a relationship with Mychael Greer, a longtime friend of both parties, in 2018. The relationship eventually became an open secret, creating animosity between Dervin and Greer. Despite their separation and her relationship with Greer, Jones maintained close contact with Dervin.

### Initial Assault

In February 2020, Jones went to a bowling alley with a close friend, Shaleena Roy. Apparently angry that Jones had gone out, Dervin went looking for her, stopping at her house and repeatedly calling friends in an attempt to locate her. Dervin eventually found Jones at the bowling alley and became enraged, accusing Jones of cheating on him with a group of teenagers playing in the next lane. When Roy attempted to calm Dervin, he "smacked" her with

2

enough force to knock her glasses from her face. He then dragged Jones out of the bowling alley and "threw her in the back of [his] car," speeding off. An interior security camera recorded the incident.

Dervin was later seen carrying an unconscious Jones from his car back into her home. Roy and Barquet went to check on Jones the next day, finding her face badly bruised and swollen. Jones stated that Dervin had knocked her out during the drive and she did not remember the rest of the evening.

Although Jones obtained a protection order against Dervin following the assault, they remained in regular contact. Jones borrowed Dervin's green Honda Accord after her own vehicle broke down.

### Jones's Death

The animosity between Dervin and Greer escalated over the course of 2020. In November 2020, Jones began moving out of the house she had shared with Dervin. On November 30, 2020, both her cousin, Alerenzo Webb, and Greer came over to help her pack. Webb left mid-afternoon, leaving Greer to continue helping.

Dervin texted Webb around 10:00 p.m. asking where Jones was. Webb informed Dervin that he was no longer at Jones's house, to which Dervin responded "she better call me ASAP." He then tried to reach Jones 10 times between 10:00 p.m. and 10:17 p.m. Jones did not pick up any of the calls. Dervin drove to Jones's house in his red Jaguar, arriving around 10:45 p.m. He saw Jones asleep with Greer through the living room window and began banging on the glass.

Hoping to avoid confrontation, Greer dressed and ran out the back door. Dervin forced his way into the home and attempted to chase Greer. Dervin pushed Jones out of the way in the process. He later admitted to a friend that the "push" left Jones unconscious but breathing. Dervin gave up on chasing Greer when he tripped on the incline behind Jones's house.

Greer jogged from the house to a nearby gas station before catching a bus home. Surveillance footage showed Greer entering the gas station at 10:56 p.m. before boarding the bus at 11:02 p.m. Greer got off the bus near his house at 11:11 p.m. Also around 11:11 p.m., a neighbor's security camera captured a shadowed figure walking outside Jones's house. The figure was not identifiable and the parties later disputed whether the footage showed one or two people.

Around 11:24 p.m., Dervin called Nichole Stone, stating that he fought with Greer and was having trouble driving because of his injuries. Stone picked Dervin up at a gas station where he had been waiting in the Honda Jones borrowed. At Dervin's request, Stone drove him around the neighborhood looking for Greer.

Around midnight, Dervin called Kendell Williams, another friend, to announce that he caught Jones with Greer. Over FaceTime,[1] Williams noted that Dervin appeared injured and Dervin stated that he needed Williams to drive his car. Barquet was with Williams when Dervin called. When Dervin noticed

---

[1] FaceTime is a mobile device service that allows users to make video calls on cell phones, tablets and laptops.

4

Barquet, he requested that he go check on Jones. He also asked Barquet to search for the keys to his Jaguar, believing he dropped them while chasing Greer.

Barquet and several friends immediately drove to Jones's house, spotting Dervin's Jaguar in the driveway. Barquet did not have a key to the house and, seeing no activity, assumed Jones had left. He and his friends then spent about 20 minutes searching for Dervin's keys. When the search brought Barquet into the backyard, he noticed that Jones's back door was open. Once inside, Barquet found his mother's body behind a loveseat. Barquet attempted CPR while one of his friends called 911. Law enforcement was dispatched around 1:19 a.m.

While Barquet went to look for Dervin's keys and to check on Jones, Williams met Dervin and Stone. They collected Dervin's Honda and Williams drove him back to Jones's house. Dervin instructed Williams to take an unusual route. Once there, Dervin waited in the Honda while Williams helped Barquet and his friends look for keys to the Jaguar.

When Barquet found Jones, Williams ran to tell Dervin that something was wrong. Dervin responded that she "should be fine," but that he needed to leave so as not to be found violating the no-contact order.

When responding officers arrived, they found Jones lying unresponsive on the living room floor, covered in bruises. Despite the use of CPR and an automated external defibrillator, Jones died on scene. Jones had injuries to her entire body. Most of her ribs were fractured, puncturing her lung eight times.

5

Law Enforcement Investigation

Greer contacted law enforcement shortly after learning of Jones's death. Intending to "clear [his] name," Greer voluntarily recorded a statement, agreed to be photographed, and consented to a search of his phone. Greer did not have any visible injuries.

The day after Jones's death, Dervin told a friend that he planned to hire a lawyer and turn himself in. He then left the state. On December 9, 2020, a Minnesota State Trooper arrested Dervin on a warrant related to Jones's death. He had a number of visible minor injuries, including cuts and bruises to his face, as well as scratch marks over his neck, scalp, and hands.

The State charged Dervin with one count of felony murder in the second degree, one count of assault in the second degree, one count of unlawful imprisonment, and one count of misdemeanor violation of a court order. The State also alleged that Dervin and Jones were intimate partners and that the offenses belonged to an ongoing pattern of domestic violence. Counts one and four addressed the night Jones died, while counts two and three pertained to the February 2020 assault. Dervin only disputed the count of felony murder in the second degree.

DNA Testing and Motion to Dismiss

As part of the law enforcement investigation, the King County Medical Examiner's Office performed DNA testing on samples from Jones's cheek, neck, and fingernails. Each sample resulted in a mixed profile containing three

individuals, including Jones herself. The samples from Jones's cheek and fingernails indicated a strong likelihood that Dervin contributed DNA.

The sample from Jones's fingernails also suggested that Greer may have contributed DNA. But without a reference sample, the lab was unable to perform any confirmatory testing. Although the lab requested a reference sample from Greer, he did not provide one.

Detective Lovesa Dvorak testified that she made several attempts to find Greer to obtain a DNA sample but was unable to do so. She also testified that testing Greer's DNA was not an investigative priority because there was no dispute that he had engaged in consensual sex with Jones the evening of her death. Because Greer's DNA would be expected at the scene, she did not believe that further testing would prove anything of value.

Although Emily Grubich, the lead DNA analyst, later discovered that Greer's DNA had been collected as part of an unrelated investigation, the lab refused defense counsel's request to perform a comparison using this sample because they only accept such requests from law enforcement agencies.

In August 2022, Dervin moved to dismiss the case, asserting that the State committed mismanagement under CrR 8.3(b) by failing to obtain the requested reference samples or authorize the testing of Greer's sample from the other investigation.

The trial court denied Dervin's motion, stating that Dervin's DNA had already been identified on other swabs and that the presence of Greer's DNA would not be materially exculpatory given the circumstances. The court did,

however, provide that defense counsel would have the opportunity to examine both Dvorak and Grubich about the State's refusal to facilitate a comparison of Greer's DNA.

## Motions in Limine

Presenting an "other suspect" defense based on implicating Greer, defense counsel then moved *in limine* to admit Greer's alleged prior acts of domestic violence under ER 404(b).  Counsel offered testimony from Adrian Manning, an ex-partner of Greer's, who reported that Greer had repeatedly assaulted her between 2000 and 2006 because he believed she was cheating on him.  Counsel also offered surveillance footage showing an alleged assault by Greer against a young woman on a train in 2020.

The court determined that Greer's relationship with Manning, over a decade earlier, was not relevant to any motive or intent toward Jones.  Rather, the court considered the evidence as inadmissible "propensity or character evidence."  The court similarly found that Dervin offered the train incident as character evidence and excluded both prior acts.

Defense counsel also sought, *in limine*, to admit evidence of Greer's prior dishonesty under ER 608(b).  Greer had been questioned as part of an unrelated homicide investigation and denied any contact with the victim.  Greer's DNA was later identified on a vaginal swab taken from the victim.  Assuming that Greer would assert his Fifth Amendment right against self-incrimination if asked about his dishonesty at trial, Dervin intended to elicit the evidence from the investigating detective.

The trial court found the detective's testimony to be inadmissible extrinsic evidence under ER 608(b). It also determined that the prejudicial effect of the evidence outweighed its probative value, as the jury would likely focus on Greer's involvement in the other case. The court lastly noted that it admitted other instances of Greer's dishonestly, stating that one more lie would not be particularly probative.

The State moved *in limine* to admit a certified Department of Licensing (DOL) photograph of Jones under ER 902. When defense counsel initially objected on relevance grounds, the State responded that the DOL evidence would be used to establish Jones's identity. Defense then challenged the admission under CrR 4.7, as the actual DOL document was not provided until trial. Defense counsel based its complaint on the fact that Jones's license listed her physical characteristics.

The court admitted the DOL photo itself but ordered the State to redact Jones's height and weight.

Trial

The case proceeded to trial in November 2022. In opening statements, the State described the testimony it anticipated from Barquet, stating that "Randi Jones would never wake up no matter how much her son begged her to. And what [Barquet] will never forget is the image of his mother bloody, bruised, and beaten on the floor of her home." Defense counsel objected on the basis of improper argument, but the trial court overruled the objection.

In closing, the State then described the four minutes of "pain and faith" Jones likely experienced as she was dying. The State imagined Jones's thoughts, asking "what is going to happen to my babies?" Defense counsel again objected, asserting an appeal to passion, but the trial court overruled them. The State then continued on, wondering "what about my babies? Is my mom going to be okay? Why am I lying here on the floor in my own home dying? Why did he do this to me?"

Dervin's closing argument centered on Greer's supposed motive and opportunity to harm Jones. The State objected to defense counsels' argument that Greer had no alibi, and the court sustained the objection. Dervin also argued that the neighbor's surveillance video showed Jones alive and walking when Dervin left. In rebuttal, the State asserted that the shadowed figure on the tape could not be Jones because, as detailed by the autopsy report, Jones was not tall enough to be visible over the top of the parked car.

At the close of arguments, defense counsel explained that Jones's driver's license showed she was much taller than the State had stated, asking to unredact the height and weight information. The court denied defense counsel's request, stating that no legal basis allows exhibits to be changed after closing arguments. The court then denied Dervin's motion for a mistrial.

The jury convicted Dervin on all charges, including a special verdict that Dervin and Jones were intimate partners. Dervin then moved for a new trial, citing the State's emotional appeal to the jury and the court's restriction on

defense counsel's closing argument concerning Greer's lack of alibi.  The court denied Dervin's motion.

Dervin appeals.

ANALYSIS

Exclusion of Evidence

Dervin asserts that the trial court erred in excluding evidence of Greer's prior assaults on women and acts of dishonesty in violation of the open door doctrine and Dervin's constitutional right to present a defense.  The State disagrees, stating that the trial court acted within its discretion in declining to admit prior assault allegations and a prior act of dishonesty unrelated to the case at issue.  Because the excluded evidence is only marginally relevant and offered mainly as propensity evidence, the trial court did not err.

We review a trial court's ruling on admissibility for an abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 59-60, 502 P.3d 1255 (2022).  A trial court abuses its discretion if " 'no reasonable person would take the view adopted by the trial court.' " *Jennings*, 199 Wn.2d at 59 (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).  We review constitutional claims de novo. *State v. Carte*, 27 Wn. App. 2d 861, 877, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024).

1. Past Assault

   a. *Open Door Doctrine*

Dervin contends that the trial court erred in excluding evidence of Greer's past assaults on women after Greer opened the door by claiming he does not

11

hurt women.  We disagree.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401.  The open door doctrine is a theory of expanded relevance.  *State v. Rushworth*, 12 Wn. App. 2d 466, 474, 458 P.3d 1192 (2020).

"The open door doctrine permits trial courts to admit evidence on a subject normally barred on policy or prejudice grounds, so long as the party who otherwise stands to benefit from exclusion has increased the subject's relevance through actions at trial."  *Rushworth*, 12 Wn. App. 2d at 475.  A party may waive protection from a usually "forbidden" topic by addressing the subject themselves.  *Rushworth*, 12 Wn. App. 2d at 473.  At that point, the opposing party is "entitled to respond."  *Rushworth*, 12 Wn. App. 2d at 473.  But even if a party can show additional relevance, the court may continue to exclude particular facts based on other evidentiary concerns.  *Rushworth*, 12 Wn. App. 2d at 474.  ER 403 provides that, even where evidence arguably becomes relevant, the court should exclude unduly prejudicial evidence.  ER 404(b) then provides that evidence intended to show propensity is generally inadmissible.

When asked at trial why the jury should believe he did not kill Jones, Greer responded, "I don't hurt females like that."  In doing so, Greer did not claim that he has never hurt women.  Rather, the implication is that Greer does not kill women.  Following the medical examiner's testimony as to the extent of Jones's injuries, the jury likely understood Greer's qualifier of "like that," to specifically

address Jones. And none of the evidence that Dervin seeks to admit indicates that Greer has ever murdered another person. Because Greer answered in response to a specific question concerning Jones's death, he did not open the door to all possible assaults Greer may have committed in the past.

In addition, neither past assault is particularly relevant to the facts at issue here. Dervin seeks to admit two examples of Greer's past violence against women: his long-term relationship with Adrian Manning and an incident on a train with an unidentified young woman. To the former, Greer and Manning's relationship ended over a decade before he began his relationship with Jones, no charges were ever pursued or filed, and the documented assault did not reach the level of harm Greer denied with respect to Jones.

Although more recent, the latter is even less relevant because no documented relationship existed between Greer and the unidentified woman and the surveillance video does not display who instigated the physical conflict. Because neither past assault makes it more probable that Greer killed Jones, the evidence lacks probative value. Without probative value, the evidence seems to be offered mainly to show Greer's propensity of violence toward women. And propensity evidence is generally inadmissible.

We conclude that Greer did not open the door to evidence of past assaults and the trial court did not abuse its discretion in denying admission of that evidence.

*b. Right to Present a Defense*

Dervin then claims that the exclusion of Greer's prior bad acts in violation of the open door doctrine violated Dervin's constitutional rights to confrontation and to present a defense. We again disagree.

In determining whether a court has violated the right to present a defense, we first look to whether the trial court abused its discretion in applying the rules of evidence. *Jennings*, 199 Wn.2d at 58. If the court did not abuse its discretion, we then consider de novo whether the exclusion violated the defendant's constitutional right to present a defense. *Jennings*, 199 Wn.2d at 58.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution grant criminal defendants the right to present testimony in their own defense. The right to present a complete defense generally includes the right to confront and cross-examine adverse witnesses. *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). But the Constitution allows judges to " 'exclude evidence that is repetitive. . ., only marginally relevant or [that] poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *Jennings*, 199 Wn.2d at 63 (some alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting prejudicial effects of that evidence. *Jennings*, 199 Wn.2d at 63.

Here, the trial court did not abuse its discretion in excluding evidence of Greer's prior assaults on women. Therefore, we next consider whether the exclusion violates Dervin's constitutional right to present a defense. We conclude that it does not; the evidence of Greer's past assaults is irrelevant and poses an undue risk of prejudice.

Looking first to the Manning evidence, not only had the relationship been over for more than a decade, but it was factually distinctive from Greer's relationship with Jones. Greer and Manning were involved in a serious, long-term partnership and share a child. In contrast, Greer and Jones were seeing each other casually. Greer testified that he did not consider Jones to be his girlfriend and it is well documented that Greer was aware Jones was still seeing Dervin.

Additionally, while Manning recalled various occasions where Greer hit her with a purse or threw a shoe at her, none of the incidents reached the level of violence Jones endured. The most serious incidents Manning described resulted in her eyes swelling shut. While that is still clearly an assault, the incidents are markedly different than Jones's broken ribs, punctured lung, and full-body bruising which ended in her death.

The train evidence is even less relevant. The surveillance footage displays a verbal "back and forth" between Greer and two other passengers on the train before one of the women appears to step forward and push him. The woman then appears to strike at Greer, who remains seated. Greer then responds by throwing the woman against the opposite bench. The video does

15

not display that Greer instigated the encounter, nor does any evidence show that Greer knew either of the two women. The circumstance is therefore drastically different than Greer's relationship with Jones.

In fact, even Dervin acknowledges that these pieces of evidence serve more as propensity evidence than anything else, lamenting that with this exclusion, the logic of "he did it once, he probably did it again," applied only to Dervin.

Neither example is relevant to the issue here. And as propensity evidence, both are unduly prejudicial. Accordingly, the Constitution permits a trial court to exclude the evidence, despite the defendant's right to present a defense. The trial court did not violate Dervin's right to present a defense.

2. Dishonesty

Dervin maintains that the trial court's exclusion of specific instances of Greer's dishonesty similarly violates his right to present a defense. The State disagrees, asserting that the specific instances of dishonesty are immaterial to Jones's murder, cumulative of other credibility evidence, and unduly prejudicial. Because the false statements are not directly related to the facts at issue, the proper exclusion under ER 608(b) does not violate Greer's right to present a defense.

Again, a defendant has a constitutional right to present a complete defense and confront witnesses. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. A violation of the right to present a defense is harmless if the reviewing

16

court finds beyond a reasonable doubt that the verdict was not affected.  *State v. Romero-Ochoa,* 193 Wn.2d 341, 348, 440 P.3d 994 (2019).

In presenting a defense, defendants must be given particular latitude to explore fundamental elements such as motive, bias, or credibility.  *Orn*, 197 Wn.2d at 354.  Therefore, the Constitution protects the ability to expose a witness's bias through cross-examination.  *Orn*, 197 Wn.2d at 347.  But Washington courts distinguish between evidence that impacts credibility in general and evidence that is constitutionally necessary to present a defense.  *Jennings*, 199 Wn.2d at 66-67.  An allegation of prior dishonesty not directly related to an issue in the case has minimal probative value.  *State v. Lee*, 188 Wn.2d 473, 488, 396 P.3d 316 (2017).

ER 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence."  The statute does, however, allow for cross-examination concerning a witness' character for truthfulness or untruthfulness at the discretion of the court.  ER 608(b).

Here, Dervin moved *in limine* to admit evidence that Greer lied to law enforcement during an unrelated homicide investigation.  The trial court denied Dervin's motion, determining that the prejudicial effect of the evidence outweighed any probative value.  The court also indicated the likelihood that the jury would speculate about Greer's involvement in the other case.

Dervin now asserts that the trial court violated his right to present a defense by excluding the specific instance of Greer's dishonesty under ER 608. We disagree.

First, the trial court did not err in excluding Greer's prior statements under ER 608(b). Under ER 608(b), extrinsic evidence is inadmissible to attack a witness's credibility. Only cross-examination concerning a witness's character for untruthfulness is admissible, and even then, at the court's discretion. Dervin acknowledged the likelihood that Greer would utilize his Fifth Amendment rights and refuse to answer a question about past lies. As a result, Dervin sought to admit testimony by the investigating detective in the unrelated case. Because that testimony is inadmissible extrinsic evidence, the trial court did not err in excluding the evidence under ER 608(b).

We next conclude that the trial court's denial under ER 608(b) did not violate Dervin's Sixth Amendment right to present a defense because Greer's past dishonesty was unrelated to the facts at issue here.

In the unrelated homicide investigation, Greer lied to law enforcement about knowing the victim. The victim had no connection to this case. And Greer's lie does not indicate any bias against Dervin or demonstrate any motive to hurt Jones. Rather, it only suggests propensity – Greer had lied to law enforcement once, so he is likely lying now. But that propensity evidence, not directly related to the issue in this case, has minimal probative value and is generally inadmissible.

18

Dervin relies on *State v. McDaniel*, 83 Wn. App. 179, 920 P.2d 1218 (1996), for the proposition that the motivation for a false statement may be more significant than its subject matter. Therefore, the fact and motive for Greer's lies to law enforcement in the other investigation demonstrate Greer's willingness to lie to law enforcement to avoid incrimination. But *McDaniel* is distinguishable.

The court in *McDaniel* improperly excluded evidence that a party had lied under oath "in a related civil proceeding." 83 Wn. App. at 180. This then indicated that the party had lied about the same events in the criminal trial, making the issue highly relevant to her credibility in that case. *McDaniel*, 83 Wn. App. at 186-87. This court has since distinguished *McDaniel* when a witness "lie[s] in an unrelated context." *State v. Fleeks*, 25 Wn. App. 2d 341, 376-77, 523 P.3d 220, *review denied*, 1 Wn.3d 1014 (2023).

Greer's false statement in the other case had no connection to the facts surrounding Jones's murder or any relationship with Dervin. Because the false statement is not related to any issue in this proceeding, its exclusion under ER 608(b) is proper and does not violate Greer's right to present a defense.

3. Harmless Error

In raising the constitutional challenges, Dervin maintains that any error is not harmless. Although we conclude that no error occurred, it is worth noting that overwhelming evidence of guilt would render any error harmless.

Evidentiary error is harmless unless, had the error not occurred, the outcome of the trial would have been materially different. *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986). Constitutional error, in contrast, is

harmless if the State establishes, beyond a reasonable doubt, that the evidence is so overwhelming that any reasonable juror would necessarily find guilt, regardless of error. *Orn*, 197 Wn.2d at 359. Reference to the Sixth Amendment does not automatically transform all evidentiary errors into errors of constitutional magnitude. *State v. Barry*, 183 Wn.2d 297, 301, 352 P.3d 161 (2015).

Here, the evidence of Dervin's guilt is so overwhelming that any error would have been harmless under either standard.

Dervin did not dispute his presence at Jones's house the night of her murder. He admitted to friends that he assaulted Jones that night, supposedly leaving her "unconscious but breathing." Law enforcement found Dervin's DNA on Jones's body, including under her fingernails. And when law enforcement took Dervin into custody, after having fled the state, he had visible injuries that indicated a physical altercation.

Furthermore, Dervin's attempt to implicate Greer was unsupported by evidence. As noted, surveillance camera footage displayed Greer bussing away from Jones's home and getting out near his own home. Nothing in the record supports Dervin's assertion that Greer turned around, came back, and killed Jones. Admitting irrelevant evidence of Greer's past assaults would not have filled in those evidentiary gaps.

So, although we conclude no error occurred, the State nonetheless establishes, beyond a reasonable doubt, that a reasonable jury would have found Dervin guilty, regardless of any error.

Removal of Redactions

Dervin contends that the court again violated his right to present a defense when it declined to allow the jury access to the height and weight information on Jones's driver's license. He then suggests that the open door doctrine required the court to remove the redaction. The State asserts that the court properly refused to alter an admitted exhibit after closing arguments. We agree with the State.

" 'A motion to reopen a proceeding for the purpose of introducing additional evidence is addressed to the sound discretion of the trial court.' " *State v. Wood*, 19 Wn. App. 2d 743, 768, 498 P.3d 968 (2021) (internal quotation marks omitted) (quoting *State v. Luvene*, 127 Wn.2d 690, 711, 903 P.2d 960 (1995)). To demonstrate reversible error, the appellant must show both a manifest abuse of discretion and resulting prejudice. *Wood*, 19 Wn. App. 2d at 768.

To reiterate, the open door doctrine permits a trial court to admit evidence on a usually forbidden topic when the party who stands to benefit from the exclusion addresses the subject. *Rushworth*, 12 Wn. App. 2d at 475. The Sixth Amendment right to present a defense establishes a criminal defendant's right to present testimony in their own defense. *Orn*, 197 Wn.2d at 352. And ER 402 governs relevance, stating that "all relevant evidence is admissible."

Here, the State moved *in limine* to admit Jones's driver's license for identification purposes. Defense counsel objected, first arguing relevance and

later asserting untimeliness. The trial court admitted Jones's driver's license photo but redacted her height and weight.

At trial, Dr. Richard Harruff, the physician who supervised Jones's autopsy, testified that Jones was five foot one. Jones's height became relevant when Dervin and the State disputed whether the surveillance video outside of Jones's house displayed one or two people walking away. Arguing that the shadowed figure was, in fact, Jones walking Dervin to his car, Dervin stated that she could not have been fatally injured when he left her. In closing, the State relied on Dr. Harruff's determination of Jones's height to suggest that Jones was too short to be visible in the surveillance footage, and therefore could not have been the figure in the video. After closing arguments concluded, Dervin asked the court to unredact the exhibit because Jones's driver's license listed her as five foot seven.

The court denied the request, determining that no legal basis exists for changing an exhibit at that point in the proceeding when neither party would have an opportunity to comment to the jury about the change. The court specifically noted that "defense could have actually asked for this earlier if they thought it was an important issue, particularly given the [medical examiner's] report" about Jones's height.

Dervin now claims that the driver's license was admissible under ER 402, the open door doctrine, and the constitutional right to present a defense. We disagree.

ER 402 does not entitle Dervin to admission of Jones's unredacted driver's license.  Although evidence of Jones's height was at least minimally relevant, and therefore admissible during trial, the evidentiary phase of trial had ended by the time Dervin sought to admit the redacted portions.  And Dervin fails to demonstrate that the trial court manifestly abused its discretion in denying his request.

Because Dervin waited until after the close of trial, neither party had the opportunity to explain the requested evidence to the jury.  And Dervin did not move to present additional testimony or argument.  Rather, he simply wanted to submit an unredacted version of the exhibit.  The trial court's decision, noting the lack of legal authority provided and Dervin's ability to have asked for admission at any point during trial, was not based on untenable grounds or reasons.  It was well within the trial court's discretion to deny Dervin's request.  So, while ER 402 does not preclude the admission of the evidence, the trial court did not abuse its discretion in denying Dervin's request.

As to the open door doctrine, Dervin was at no point precluded from admitting evidence about Jones's height.  Indeed, Jones's height was not a "forbidden" topic breached by the party who would benefit from its exclusion.  The State did not request the redaction.  Dervin himself acknowledges that the redaction of the driver's license was an attempt to sanction the State for submitting the evidence in an untimely manner.  Dervin simply did not anticipate the way the State would use Dr. Harruff's testimony.

Though Dervin complains that the court's denial of his request "allowed the prosecutor's rebuttal to stand as if Jones's small stature were an undisputed fact," the only reason Jones's height was "undisputed" is that Dervin did not dispute it. The court did not preclude Dervin from doing so at any other point during trial. The open door doctrine does not entitle Dervin to present a modified exhibit to the jury.

Lastly, Dervin asserts that the trial court restricted his defense in violation of his Sixth Amendment rights by not allowing the admission. He maintains that Jones's height was relevant evidence he had a right to present. But he mischaracterizes the issue. The question is not whether the evidence was relevant. Rather, the question is whether Dervin had a right to alter the evidence admitted after the close of the case.

Even if Dervin's request could be considered a motion, a trial court has broad discretion in allowing, or not allowing, a motion to reopen a proceeding for the purpose of introducing additional evidence. Because Dervin presented no legal authority supporting his request to admit the additional evidence, the trial court acted within its discretion and did not violate Dervin's right to present a defense.

The court did not err in denying Dervin's request to remove the redactions.

<u>DNA Testing</u>

Dervin next asserts that the government's mismanagement of Greer's DNA testing violated his constitutional right to present a defense and that the trial court erred in denying his motion for dismissal. The State maintains that the

24

State was not required to conduct further investigation on Dervin's behalf and that Dervin fails to establish the prejudice needed for dismissal. Once again, we agree with the State.

We review a trial court's power to dismiss charges for a manifest abuse of discretion. *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997). A trial court abuses its discretion if its decision is unreasonable or based on untenable grounds or reasons. *Michielli*, 132 Wn.2d at 240. We review a denial of the constitutional right to present a defense de novo. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

The Sixth Amendment right to present a defense is, " 'in essence, the right to a fair opportunity to defend against the State's accusations.' " *Jones*, 168 Wn.2d at 720 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). CrR 8.3(b) then provides that, in the furtherance of justice, a court may dismiss a criminal prosecution when governmental misconduct affects that fair opportunity. The governmental misconduct must result in prejudice to the rights of the accused, which "materially affect the accused's right to a fair trial." CrR 8.3(b). The challenged governmental action need not be malicious; simple mismanagement may be sufficient. *Michielli*, 132 Wn.2d at 243. But while the State is required to preserve and disclose all potentially material and favorable evidence, this rule " 'has not been interpreted to require police or other investigators to search for exculpatory evidence, conduct tests, or exhaustively pursue every angle on a case.' " *State v. Judge*,

100 Wn.2d 706, 717, 675 P.2d 219 (1984) (quoting *State v. Jones*, 26 Wn. App. 551, 554, 614 P.2d 190 (1980)).

1. CrR 8.3(b) Motion to Dismiss

Dervin claims that the State's mismanagement of evidence materially affected his right to a fair trial because it prevented him from presenting evidence of his affirmative defense. Therefore, the trial court erred in denying his motion for dismissal.

To warrant dismissal under CrR 8.3(b), the moving party must establish prejudice by a preponderance of the evidence. *State v. Kone*, 165 Wn. App. 420, 432-33, 266 P.3d 916 (2011). To do so, the movant must show that the alleged mismanagement interfered with their ability to present a defense. *City of Kent v. Sandhu*, 159 Wn. App. 836, 841, 247 P.3d 454 (2011). "[T]he mere possibility of prejudice is insufficient." *State v. Krenik*, 156 Wn. App. 314, 320, 231 P.3d 252 (2010).

Dervin points to three cases in support of his proposition that the State's mismanagement materially affected his ability to present a defense: *State v. Burri*, 87 Wn.2d 175, 550 P.2d 507 (1976), *State v. Youde*, 174 Wn. App. 873, 301 P.3d 497 (2013), and *State v. Long*, 32 Wn. App. 732, 649 P.2d 845 (1982). Each is distinguishable.

In *Burri*, the State summoned all six of Burri's alibi witnesses to a "special inquiry," prevented Burri from attending, and then ordered the witnesses not to discuss their testimony. *Burri*, 87 Wn.2d at 176. The court dismissed the case, determining that the State's conduct constituted a "substantial, unauthorized

interference." *Burri*, 87 Wn.2d at 179. *Burri* is distinguishable because the State here did not create new evidence and then prevent Dervin from assessing it. Rather, the State did not conduct additional investigation it is not otherwise required to perform. *Burri* does not require such additional testing.

*Youde* provides that a dismissal is appropriate where, "by an assertion of sovereign immunity, a defendant was prevented from obtaining material information in the hands of a third party not subject to the court's power." 174 Wn. App. at 884. Here, the State did not prevent Dervin from obtaining any material evidence. It simply did not conduct additional testing to create that evidence. Like *Burri*, *Youde* does not require any affirmative investigation.

Lastly, Dervin cites *Long*. In *Long*, the defendant pleaded self-defense at trial. 32 Wn. App. at 733-34. One witness was prepared to testify that the victim had a knife and had lunged at Long first. *Long*, 32 Wn. App. at 733-34. When a detective placed that witness under hypnosis and questioned them about the incident, the witness newly recalled that the victim was unarmed and did not initiate the assault. *Long*, 32 Wn. App. at 734. The court dismissed the case because the hypnotic session was intended to "change the story of the key witness." *Long*, 32 Wn. App. at 737. Here, nothing indicates that the State tampered with evidence. Instead, Dervin wanted the State to conduct additional testing to create new evidence. *Long* is distinguishable.

*Jones* in contrast, is instructive. In *Jones*, a victim had been murdered by strangulation and the killer's identity was the only issue at trial. 26 Wn. App. at 552. Although the defendant's palm print had been found and identified at the

27

scene, several other fingerprints had been found but not identified. *Jones*, 26 Wn. App. at 552-53. The defendant claimed he was denied a fair trial based on the State's failure to adequately investigate the source of the other prints. *Jones*, 26 Wn. App. at 552-53.

The court explicitly determined that the State has no duty to "expand the scope of a criminal investigation." *Jones*, 26 Wn. App. at 554. Therefore, that "[t]he jury was aware of the latent fingerprints and that the prints had not been identified" was constitutionally sufficient. *Jones*, 26 Wn. App. at 555. The court also noted that the defendant at no point requested a court order requiring the State to compare the fingerprints with another identified suspect. *Jones*, 26 Wn. App. at 555.

Here, Detective Dvorak had no reason to seek comparison samples from Greer because no one disputed that Greer had recently been in the house and had engaged in sexual activity with Jones. Identifying his DNA at the scene would hardly have been inculpatory. And the State has no duty to expand its investigation to uncover exculpatory evidence for the defendant.

Furthermore, Dervin could have sought court orders compelling a DNA sample from Greer. Dervin states that Greer was "uniquely available to the [S]tate" based on the animosity between the parties, but such animosity does not supersede a court order.

We conclude that the record does not indicate any governmental mismanagement because the State has no affirmative duty to search for exculpatory evidence or conduct tests to create that evidence. Accordingly, the

trial court did not abuse its discretion in denying Dervin's CrR 8.3(b) motion for dismissal.

### 2. Right to Present a Defense

Dervin also claims that the State's interference violated his Sixth Amendment right to present a defense because it undermined his ability to present affirmative evidence of his "other suspect" defense. We again disagree.

The Sixth Amendment right to present a defense includes one's decision to present an affirmative defense. *State v. Coristine*, 177 Wn.2d 370, 376, 300 P.3d 400 (2013). "Violations of the rights to present a defense . . . are subject to constitutional harmless error review." *Orn*, 197 Wn.2d at 359. An error is not grounds for reversal if the appellate court is " 'assured [by the State] beyond a reasonable doubt that the jury would have reached the same verdict without the error.' " *Orn*, 197 Wn.2d at 359 (alteration in original) (quoting *Romero-Ochoa*, 193 Wn.2d at 347).

Dervin asserts that the State violated his right to present a defense because Dervin has a right to present his affirmative "other suspect" defense, "along with scientific evidence supporting that defense." Because the government's misconduct prevented Dervin from presenting that scientific evidence, he asserts, the misconduct constitutes a violation requiring reversal. But, as noted above, the State did not mismanage existing evidence and has no duty to create new evidence to support a defendant's affirmative defense. Without any evidence of misconduct preventing Dervin from presenting evidence, no constitutional violation exists.

Prosecutorial Misconduct

Dervin contends that the State committed prosecutorial misconduct in both its opening statement and closing argument by attempting to encourage a verdict based on an emotional appeal. The State concedes that the State's statements in closing argument, speculating as to what Jones might have been thinking as she died, were improper. The State asserts that the opening statement, however, was not improper because it accurately described the evidence the prosecutor expected would be produced at trial. The State then contends that Dervin fails to establish prejudice denying him a fair trial from either challenged statement. Though some of the prosecutor's conduct was improper, because Dervin fails to establish prejudice, no substantial likelihood exists that it affected the jury's verdict.

We review claims of prosecutorial misconduct for an abuse of discretion, viewing the allegedly improper statements within the context of the entire case. *State v. Molina*, 16 Wn. App. 2d 908, 918, 485 P.3d 963 (2021).

To prevail on a claim for prosecutorial misconduct, a defendant who timely objects must prove that the prosecutor's " 'conduct was both improper and prejudicial in the context of the entire trial.' " *State v. Zamora*, 199 Wn.2d 698, 708, 512 P.3d 512 (2022) (internal quotation marks omitted) (quoting *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). Conduct is prejudicial if the defendant can show a substantial likelihood that the error affected the jury verdict. *Molina*, 16 Wn. App. 2d at 968.

Where a defendant does not object at trial, they are deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury. *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 42 (2011). Counsel's decision not to object or to request a curative instruction "strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial." *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990).

That prosecutors may not encourage a verdict based on emotional appeals is well established. *State v. Pierce*, 169 Wn. App. 533, 552-53, 280 P.3d 1158 (2012); *State v. Belgarde* 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). Similarly, prosecutors may not rely on information not presented to the jury. *Pierce*, 169 Wn. App. at 552-53. Therefore, narrating a decedent's experience in the first-person is usually inappropriate because such arguments rely on an internal dialogue outside of evidence. *Pierce*, 169 Wn. App. at 555.

1. Opening Statement

Dervin asserts that the prosecutor committed misconduct in attempting to inflame the jury's emotions about Barquet's experience finding his mother's body. The State disagrees, contending that the prosecutor's statements were not

objectionable because they accurately described the evidence she expected would be produced at trial. The State also contends that Dervin fails to establish prejudice. We agree with the State.

An opening statement serves "to outline the material evidence the State intends to introduce" as well as the "reasonable inferences which can be drawn therefrom." *State v. Kroll*, 87 Wn.2d 829, 834-35, 558 P.2d 173 (1976). But an opening statement should not include argument or inflammatory remarks. *Kroll*, 87 Wn.2d at 835.

During opening statements, the prosecutor referenced Barquet's experience finding his mother's body, stating

> Randi Jones would never wake up no matter how much her son begged her to. And what [Barquet] will never forget is the image of his mother bloody, bruised, and beaten on the floor of her home. That, members of the jury, is an image that he will have to live with for the rest of his life.

These statements, Dervin suggests, improperly ground the case in the jury's sympathy for a young man who just lost his mother. The State counters Dervin's interpretation, asserting that these statements were merely an accurate description of the evidence it expected to elicit from Barquet at trial.

*State v. Brown*, 132 Wn.2d 529, 940 P.2d 546 (1997), is instructive here. The State charged Brown with the brutal murder of Holly Washa. *Brown*, 132 Wn.2d at 543. In opening, the prosecutor stated:

> I want to assure you at the end of this case you're not going to look at me and say, "Did he do it?" I suggest that you're going to look at me and you're going to say, "How could he have done it?" And, you know, that's one question that I won't be able to answer for you. I don't have an answer for you. I can't image how any person

32

could have done this to Holly Washa or to any other living human being. How could he have done it?

*Brown*, 132 Wn.2d at 562.

At the close of trial, the defense moved for a mistrial based on the prosecutor's personalized and emotional appeal to the jury in opening statements. The Washington Supreme Court determined that the statement was not improper because it "informed the jury what the [S]tate's evidence was expected to show." *Brown*, 132 Wn.2d at 563.

Here, the prosecutor's statements are analogous. The prosecutor accurately described the evidence that was presented at trial. Through the 911 call made by Barquet's friend and the responding officer's body camera footage, the jury did see Barquet's devastation, begging for Jones to wake up. Therefore, in the context of the entire trial, the prosecutor's opening statements referencing Barquet begging his mother to wake up outlined the material evidence the State intended to introduce. But the prosecutor's editorializing around those statements was a clear appeal to the jury's emotions. The State did improperly ground the case in an emotional appeal.

We conclude, however, that Dervin fails to establish a substantial likelihood that the error affected the verdict.

The trial court properly instructed the jury that "the lawyer's statements are not in evidence" and that they must "disregard any remark, statement, or argument that is not supported by the evidence or the law." Additionally, as noted, the jury saw evidence of Barquet's devastation through the 911 call recording and the body camera footage. That the prosecutor's opening

statement referencing that evidence had a greater impact on the verdict than the actual evidence did is unlikely. Therefore, the State did not commit prosecutorial misconduct in its opening statements.

### 2. Closing Argument

Dervin next asserts that the prosecutor committed misconduct in speculating, in the first person, about Jones's thoughts as she died. The State concedes that this emotional reference to Jones's potential thought-process was improper. But the State maintains that Dervin fails to establish a substantial likelihood that the improper statements affected the verdict. Because Dervin fails to establish prejudice, we conclude that the prosecutor's actions do not constitute prosecutorial misconduct.

Dervin challenges two statements. First, the prosecutor imagined out loud "what is going to happen to my babies? Is my mom going to be okay? Why am I lying in my own home dying? Why did he do this to me?" And second, at the close of arguments, the prosecutor returned to the same theme, noting that in her "last four minutes of pain and faith," Jones might have had "one last comforting thought. . . that maybe after these four minutes, she'll see [her father] again."

#### a. Statement Referencing Jones's Father

Beginning with the latter, Dervin did not object to the prosecutor's statements. As a result, Dervin must prove that the prosecutor's conduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. Dervin fails to do so.

34

As noted above, the trial court instructed the jury that the lawyers' statements are not evidence and that the jury must disregard any argument not supported by evidence or the law. Dervin presents no evidence that the jury was unlikely to follow these instructions.

Additionally, the prosecutor's statements were limited in scope and a small part of the entire closing argument. While the prosecutor's statements referencing Jones's father were improper, they could have been easily stricken without losing much, if any, of the State's actual argument. Therefore, although the prosecutor's conduct was flagrant and ill-intentioned and clearly aimed at inflaming the jury, Dervin fails to establish prejudice.

The State did not commit prosecutorial misconduct in referencing Jones's father.

### b. First-Person Thought Process

Because Dervin did object to the prosecutor's first-person speculation as to Jones's thoughts as she died, the normal standard applies. Dervin must prove that the prosecutor's conduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Despite the fact that the prosecutor clearly intended to appeal to the jury's emotions, we again determine that Dervin fails to establish prejudice.

Once again, the trial court appropriately instructed the jury on what it could and could not consider. Dervin presents no evidence that the jury was unlikely to follow these instructions.

Next, the prosecutor's first-person statements, though obviously improper, were a small piece of the overall closing argument. In fact, the prosecutor tempered her own statements, noting "we will never, ever be able to know what Randi Jones'[s] last thoughts were." The prosecutor then recounted the extent of the evidence implicating Dervin. As a result, the jury relying mainly on the prosecutor's fleeting emotional appeal in making its determination is unlikely.

Plus, Dervin had the opportunity to respond the prosecutor's statements. Defense counsel actually referenced the prosecutor's reliance on sympathy, stating,

> [S]ympathy is a very real emotion. It's very powerful, it's also appropriate in the sense of Ms. Jones should still be here. That is a very valid feeling. But that feeling doesn't answer the question, "[w]ho wielded this weapon?"

In doing so, Dervin took the opportunity to shift the jury away from purely emotional decision-making.

Dervin references two cases to demonstrate sufficient prejudice, establishing that an emotional argument may be incurable by instruction and that jurors are unlikely to disregard an argument that the trial court appears to have approved of by overruling an objection. But each case is distinguishable.

In *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012), the prosecutor deliberately altered exhibits to express a personal opinion on the defendant's guilt. This, the court determined, may have resulted in an emotional response incurable by instruction. No such deliberate alteration took place here.

In *State v. Davenport*, 100 Wn.2d 757, 764, 675 P.2d 1213 (1984), the court determined that the jury "clearly" relied on an improper statement during deliberation and that the trial court's overruling lent an "aura of legitimacy" to an otherwise improper argument. Here, no such clear evidence shows that the jury relied on the improper statement. Additionally, in contrast to *Davenport*, the prosecutor here did not misstate any law and Dervin had the opportunity to respond to the prosecutor's arguments.

Dervin fails to establish a substantial likelihood that the prosecutor's improper statements impacted the jury's verdict.

<u>Restriction of Closing Arguments</u>

Dervin alleges that the court violated his constitutional rights to counsel and due process by restricting his closing argument. Because the court only excluded statements that misrepresented the evidence, the trial court did not violate Dervin's constitutional right to counsel or due process.

Closing argument is "a basic element of the adversary factfinding process in a criminal trial." *Herring v. New York*, 422 U.S. 853, 858, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). Because closing argument is the defendant's last chance to persuade the fact finder of a reasonable doubt, defense counsel must generally be afforded the " 'utmost freedom in the argument of the case.' " *State v. Perez-Cervantes*, 141 Wn.2d 468, 472, 6 P.3d 1160 (2000) (quoting *Sears v. Seattle Consol. St. Ry. Co.*, 6 Wash. 227, 232, 33 P. 389 (1893)). That said, arguments must be restricted to the facts and law of the case, "lest the jury be confused or misled." *Perez-Cervantes*, 141 Wn.2d at 474. And though the trial court has

broad discretion to restrict closing arguments, improper limitation of closing argument may infringe upon a defendant's due process rights and right to counsel. *Perez-Cervantes*, 141 Wn.2d at 472, *State v. Frost*, 160 Wn.2d 765, 772-74, 161 P.3d 361 (2007), *see also Herring*, 422 U.S. at 862.

Accordingly, the court should only exclude statements " 'that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury.' " *State v. Woolfolk*, 95 Wn. App. 541, 549, 977 P.2d 1 (1999) (quoting *United States v. DeLoach*, 504 F.2d 185 (D.C. Cir. 1974)). Courts may not prevent the defense from arguing that the State has failed to present sufficient evidence to meet its burden of proof. *Frost*, 160 Wn. 2d at 777-79. But a party generally cannot comment on an opponent's failure to call a witness if the witness's absence can be adequately explained. *State v. Blair*, 117 Wn.2d 479, 489, 816 P.2d 718 (1991).

We review a trial court's limitation of the scope of closing argument for an abuse of discretion. *State v. Goss*, 189 Wn. App. 571, 582, 358 P.3d 436 (2015). " 'This court will find that a trial court abused its discretion only if no reasonable person would take the view adopted by the trial court.' " *Goss*, 189 Wn. App. at 582 (quoting *Frost*, 160 Wn.2d at 771)). We review constitutional issues de novo. *Carte,* 27 Wn. App. 2d at 877.

Here, mid-trial, the State informed the court that it intended to offer testimony from Greer's roommate, Michelle Vasquez, as alibi evidence. Dervin objected under CrR 4.7 because the State had not provided a timely summary of the anticipated testimony. The court granted Dervin's motion and excluded

Vasquez from the State's case-in-chief as a sanction for violating CrR 4.7. The State raised concern that Dervin would then argue that no evidence of any alibi existed. The court recognized that concern but upheld its ruling.

In closing, Dervin then stated, "[w]e have reasonable doubt here from a lack of evidence. There has been no testimony of any conversation with or information from supposed alibi witnesses of Mychael Greer after he went home." The State objected and the court sustained the objection. Dervin later moved for a new trial based on the court having sustained the objection, which the court denied.

Dervin asserts that the court erred in sustaining the State's objection for three reasons: it violated Dervin's right to counsel, it violated due process by expressly assuring defense counsel that the argument was permitted and then sustaining the State's objection, and it violated due process in restricting defense counsel's ability to assert the State failed to present evidence to support its burden of proof. We disagree.

1. Right to Counsel

Dervin first claims that the trial court improperly restricted closing argument, therefore violating his Sixth Amendment right to counsel. But a trial court may exclude statements that misrepresent the evidence of the case.

Here, Dervin insinuates that no alibi evidence exists because the State failed to produce testimony from the "supposed" alibi witness. But this misrepresents the evidence. The State could not produce Vasquez's testimony because the trial court excluded that testimony at Dervin's request, not because

39

it did not exist. And as noted, defense counsel generally may not comment on the State's failure to call a witness if that witness's absence is easily explained. Dervin was fully aware that the State could not present Vasquez's testimony. And the trial court only limited Dervin's ability to comment on that missing testimony. It did not limit any other reference to a lack of alibi.

2. Due Process

Dervin next contends that the court's ruling violated due process by "bait and switch[ing]" defense counsel, expressly assuring Dervin that argument was permitted and then sustaining an objection. But this is a misrepresentation of the record. While the trial court did indicate that defense counsel could "argue that there is no proof of what time [Greer] came home," it did not indicate that defense counsel could focus on the State's failure to call a specific witness that had been excluded at Dervin's request. The court made no such express assurance.

Dervin then cites to *DeLoach* to assert that a trial court violates due process by sustaining objections that restrict the defendant's right to "have his theory of the case argued vigorously to the jury." *DeLoach*, however, is non-binding and distinguishable. A District of Columbia Circuit case, *DeLoach* does not govern Washington appellate courts. Additionally, *DeLoach* involved "a sea of prosecution objections" that completely restricted defense counsel's ability to argue that a different suspect was responsible for the crime at issue. 504 F.2d at 188. Here, the court did not prevent Dervin from inferring that Greer was the true culprit. Rather, the single sustained objection simply prevented defense counsel from leveraging an exclusionary ruling they themselves requested.

40

Lastly, Dervin asserts that the trial court violated due process by restricting defense counsel's ability to assert that the State failed to present evidence to support its burden of proof. But the court directly addressed this concern, stating:

> I wouldn't have ever sustained an objection to challenges to evidence that the State put on about where Mr. Greer went, here or there, but Defense in this case specifically said – there was a comment on the failure to call a particular alibi witness that I excluded at the Defense request, and I think at that point the Court has discretion to prohibit that precise argument about not calling a witness that Defense successfully got excluded.

The trial court only restricted Dervin's ability to disparage the State for failing to provide the alibi witness excluded at his request. The trial court did not prevent Dervin from making any other references to a lack of alibi or asserting that the State failed to meet its burden of proof. In fact, as evidenced by the rest of closing argument, the trial court allowed Dervin to reference the lack of alibi and point out other holes in the presented evidence.

Because the court only excluded statements that misrepresented the evidence, the court did not violate Dervin's due process rights.

## Cumulative Error

Dervin then states that cumulative error deprived him of a fair trial. We disagree.

The cumulative error doctrine applies when " 'a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless.' " *State v. Azevedo*, 31 Wn. App. 2d 70, 85, 547 P.3d 287 (2024) (quoting *In re Pers. Restraint of Cross*, 180 Wn.2d 664,

41

690, 327 P.3d 660 (2014) (*abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018)).  "The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial." *Cross*, 180 Wn.2d at 690.

Here, the only established trial errors are the prosecutor's improper speculation into Jones's first-person thought process and their editorializing around Barquet's anticipated testimony.  But Dervin failed to prove prejudice.  Because reversal under the cumulative error doctrine requires substantial prejudice, and Dervin fails to show prejudice, reversal is not warranted.

Scrivener's Error

Lastly, Dervin asserts that remand is necessary to correct a scrivener's error about community custody conditions.  We remand for the trial court to correct the error.

A scrivener's error is a clerical mistake that, when amended, correctly conveys the court's attention as expressed in the record at trial.  *State v. Hayes*, 177 Wn. App. 801, 811, 312 P.3d 784 (2013).  A court may correct a scrivener's error in a judgment at any time.  CrR 7.8(a).  Remand to the trial court for correction is the appropriate remedy.  *State v. Gwin*, 31 Wn. App. 2d 295, 310, 548 P.3d 970 (2024).

Here, in its oral ruling, the trial court ordered terms of community custody to run concurrently.  In fact, the court specifically stated, "I'm not going to order consecutive community custody."  Nonetheless, the judgment and sentence

provided that the community custody conditions were to run consecutively. Because the judgment and sentence contradicts the court's expressly stated intention, the judgment reflects a scrivener's error.

We affirm but remand for the trial court to correct that error.

WE CONCUR: